# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Savon Johnson** | |
| v. | Civil Action No. 19-2190 |
| **Pennsylvania National Mutual Casualty Insurance Company,** *et al.* | |

## MEMORANDUM

This case arises out of Savon Johnson's $1,615,000 judgment against City Homes Inc., City Homes III, LP, and Barry Mankowitz,[1] in the Circuit Court for Baltimore City, (ECF 31-3, Proposed Second Amended Complaint ("SAC") at ¶¶ 2–5 & n.1), for exposure to lead-based paint between January 1996 and August 1996 at a property owned by the City Homes defendants, (*id.* ¶ 36). The City Homes defendants were insured by Pennsylvania National Mutual Casualty Insurance Company ("Penn National") for the time period at issue. Pending before the court are Penn National's motion to strike the jury demand (ECF 11) and motion to dismiss the complaint (ECF 13); its motion to strike the first amended complaint or, in the alternative, motion to dismiss (ECF 18); and Johnson's motion for leave to file a second amended complaint (ECF 31).[2] The motions have been fully briefed and no oral argument is necessary.

## FACTS

The facts are drawn from the proposed second amended complaint.[3] Penn National issued a general liability policy to City Homes, Inc. on October 3, 1991, and the policy was

---

[1] City Homes, Inc., City Homes III, LP, and Mankowitz will be referred to as the "City Homes defendants." City Homes, Inc. and City Homes III, LP, will be referred to collectively as "City Homes."
[2] Also pending is Johnson's motion for leave to file a surreply. Penn National has filed an opposition, which also addresses the contentions in the surreply. While the court agrees with Penn National that surreplies are disfavored, as both parties have briefed the issues in the surreply, the court will grant Johnson's motion.
[3] The procedural history is complex. Johnson filed a complaint in state court, along with an emergency motion for a temporary restraining order and preliminary injunction. (ECF 1-2, ECF 5). Penn National removed the case to this court on July 25, 2019. (ECF 1). On July 29, 2019, Johnson withdrew the emergency motion. (ECF 10). On

1

renewed annually until October 3, 1996,[4] and by agreement from October 3, 1996, to August 1, 1997. (SAC ¶¶ 8–9). The policies until October 3, 1995, were endorsed with Form CG 2504 11/85, which amended the $1,000,000 general aggregate limit of insurance so that the $1,000,000 in coverage applied separately to each location owned by or rented to the insureds, which included City Homes III, LP, and Mankowitz. (*Id.* ¶¶ 8–10). The policy from October 3, 1996, to August 1, 1997, was endorsed with Form 71 0680 04/96, which, like the previous endorsement, amended the $1,000,000 limit to apply on a per location basis. (*Id.* ¶ 11). The crux of the dispute regarding this policy revolves around the lack of the per location endorsement for the period October 3, 1995, to October 3, 1996, which is the period during which Johnson was harmed by the insureds.

On September 29, 1995, Angela Nesbitt, an employee of City Homes, Inc.'s insurance broker National Insurance Services, Inc., wrote to Mankowitz c/o City Homes, Inc., regarding both the 94–95 and the 95–96 insurance policies. (*Id.* ¶ 12). She wrote that "[a]ll endorsements which relate to your 94–95 policy have also been included" but that there were several errors in the 95–96 policy, including the need to "[r]emove the lead exclusion" and "[a]dd the following liability forms <u>or</u> advise why they were not included: . . . CG 2504 11/85." (*Id.* ¶¶ 12–13). Nesbitt also wrote that "[e]ndorsements will be issued to correct these problems." (*Id.* ¶ 12). National Insurance Services did obtain an "amendatory endorsement" to remove the lead exclusions, but never received Form CG 2504 11/85, the per location endorsement. (*Id.* ¶¶ 15–

---

August 1, 2019, Penn National filed a motion to strike the jury demand (ECF 11) and a motion to dismiss (ECF 13). Johnson filed an amended complaint on August 15, 2019. (ECF 14). Penn National filed a motion to strike the amended complaint or, in the alternative, a motion to dismiss, on August 28, 2019. (ECF 18). On November 7, 2019, Johnson filed a motion for leave to file a second amended complaint (ECF 31), which Penn National opposes (ECF 33), arguing that it is unduly delayed, prejudicial, and futile. Because the court finds it is not unduly delayed or prejudicial, discussed *infra*, and because the allegations in the second amended complaint must be considered to determine if the amendment is futile, the court will draw from the second amended complaint in recounting the facts.

[4] It appears that "October 3, 1997" in paragraph 9 of the second amended complaint should be "October 3, 1996."

16). According to Johnson, upon information and belief, Mankowitz believed that the omission of the per location endorsement was a mistake and that Penn National had issued an amendatory endorsement, the same way it issued the amendatory endorsement to remove the lead exclusion. (*Id.* ¶ 16). Further, Penn National never advised Mankowitz as to why the per location endorsement was not included. (*Id.* ¶ 18).

Penn National also issued a commercial umbrella liability policy to City Homes, Inc., under which City Homes III, LP, and Mankowitz were insureds, beginning in October 3, 1992, and renewed through August 1, 1997. (*Id.* ¶ 20–21). The umbrella policy had a limit of $10,000,000. (*Id.* ¶ 20).

City Homes, Inc. and its affiliated businesses (including defendant City Homes III[5]) filed for Chapter 11 Bankruptcy in the U.S. Bankruptcy Court for the District of Maryland on September 10, 2013. (*Id.* ¶ 22). Mankowitz was not a debtor in the bankruptcy case. (*Id.* ¶ 24). A final order confirming the Chapter 11 bankruptcy plan was entered on April 13, 2017. (*Id.* ¶ 23; *see* ECF 18-3, Third Amended Chapter 11 Plan; ECF 18-4, Order Confirming Third Amended Chapter 11 Plan).[6] The bankruptcy plan provides that lead-paint claimants "shall be entitled to enforce Lead-Paint Insurance Rights against any Lead-Paint Insurance Entities to the same extent as the [debtors] . . . would be entitled to enforce such rights, including but not limited to the [debtors'] right to assert willful, bad faith or negligent refusal to settle claims." (SAC ¶ 32) (alterations in the proposed SAC). The bankruptcy plan also provides for the debtors

---

[5] City Homes III is listed as a limited partnership (City Homes III, LP) in this case, but was listed as a limited liability company (City Homes III, LLC) in the bankruptcy case. (*Id.* ¶ 22 n.2). It appears that City Homes III, LP, and City Homes III, LLC, are the same entity.

[6] In reviewing a Rule 12(b)(6) motion to dismiss, the court may "consider documents incorporated into the complaint by reference . . . as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (internal quotation marks and citations omitted). As the bankruptcy court documents, the insurance policy documents, and the insurance rights transfer agreement are integral to the complaint, attached to the complaint or the pleadings, and have not been challenged, the court will consider them.

to assign to the lead-paint claimants the debtors' rights to pursue the insurers for contractual or extra-contractual damages arising out of the lead-paint claims. (*Id.* ¶ 35).

Johnson filed suit against the City Homes defendants in the Circuit Court for Baltimore City on March 1, 2013. (*Id.* ¶ 36). Penn National provided the defense. (*Id.* ¶ 37). The case was stayed pending the bankruptcy proceedings, and the trial took place from February 4, 2019, through February 22, 2019, resulting in a $2,200,000 verdict and judgment for Johnson. (*Id.* ¶ 38–39). The notice of recorded judgment was filed and indexed on March 7, 2019, (*id.* ¶ 39), but the judgment was later reduced to $1,615,000 on or about August 22, 2019, (*id.* ¶ 3 n.1).

On March 13, 2019, Penn National informed Mankowitz that the $1,000,000 limit under the general liability policy had been exhausted, and there was $4,702,726.46 of the $10,000,000 limit remaining under the umbrella policy. (*Id.* ¶ 42). It appears this is the first time Mankowitz understood that Penn National was taking the position that the 95–96 general liability policy did not include the per location endorsement. (*Id.* ¶ 43). On June 21, 2019, Penn National informed Mankowitz that only $1,005,046.85 was left under the umbrella policy, (*id.* ¶ 45), and by August 5, 2019, the umbrella policy was exhausted, (*id.* ¶ 46). On July 22, 2019, Zvi Guttman, the Chapter 11 Trustee, transferred and assigned to Johnson any and all of City Homes' rights to pursue Penn National for contractual and extra-contractual damages arising out of Johnson's lead paint claim. (*Id.* ¶ 49).

Johnson brings five counts in his proposed second amended complaint, two of which are newly added. The newly added counts are for breach of contract (Count I), against Penn National; and violation of the Md. Insurance Code § 19-102(b)(2) (Count II), against Penn National. Johnson also brings a tort claim for bad faith failure to settle (Count III), against Penn National; a claim for reformation based on mutual mistake (Count IV), against all defendants;

and a request for declaratory judgment that the general liability policy for 1995–1996 includes a per location endorsement (Count V). All counts except Count II appear to be brought based on City Homes' assignment of their causes of action against Penn National to Johnson. (*See* ECF 32-1, Insurance Rights Transfer Agreement). Through the various filings, Penn National seeks to dismiss and/or strike all counts or prevent Johnson from amending his complaint to include the additional counts.

## STANDARD OF REVIEW

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

Leave to amend should be freely granted under Rule 15(a), and amendments are generally accepted absent futility, undue prejudice, or bad faith. *See Foman v. Davis*, 371 U.S.

178, 182 (1962); *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009) (explaining that leave to amend "should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile"). An amendment is futile when the proposed amended complaint would not satisfy the requirements of the federal rules. *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008).

## DISCUSSION

### I. Second amended complaint

The court will grant leave for Johnson to file the second amended complaint, except as to Counts I and III of the proposed second amended complaint which, as discussed below, would be futile. Granting leave to amend is not unduly prejudicial to Penn National. First, the parties have not yet engaged in discovery. Second, the counts that will go forward – which relate to the limits of the 95–96 general liability policy – were either in the initial or amended complaints or are additional theories of recovery. *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) ("An amendment is not prejudicial, by contrast, if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred.").

### II. Claims regarding the umbrella policy

#### a. Breach of contract

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). Johnson argues that Penn National breached the umbrella policy by not paying Johnson's judgment against the City Homes defendants on March 17, 2019, when Johnson gained the ability to execute on his judgment

through the legal process, (SAC ¶ 56), and before the umbrella policy had been exhausted, and by failing "to protect the funds necessary to provide coverage for [Johnson's] judgment." (*Id.* ¶¶ 58–59, 61).

Johnson has not adequately pled that Penn National had a contractual obligation to pay Johnson before the judgment amount was certain, or to preserve money under the umbrella policy to pay Johnson's judgment. Section 1 of the umbrella policy obligates Penn National to "pay on behalf of the insured the 'ultimate net loss' in excess of the 'applicable underlying limit' which the insured becomes legally obligated to pay as damages . . . ." (ECF 4-13, Umbrella Policy, § 1.1). Penn National has the right to "investigate and settle any claim" which is payable under the umbrella policy. (*Id.* § 1.2(c)). Additionally, Penn National may appeal a judgment which exceeds the applicable underlying limit. (*Id.* § 4.1).

Here, Penn National contested the amount of the judgment, and the judgment was subsequently reduced on or about August 22, 2019. (SAC ¶ 3 n.1). This is after the umbrella policy became exhausted on August 5, 2019. Therefore, because the judgment amount was not certain until at least August 22, 2019, Johnson has not plausibly alleged that Penn National had a contractual obligation to pay the judgment before then.[7] Further, Johnson has not sufficiently alleged that Penn National had an obligation to preserve the money under the umbrella policy to pay Johnson's judgment even before Penn National had an actual obligation to pay. Rather, it appears that Penn National's right to settle claims gave it the right to settle other claims between when Johnson gained the ability to execute on his judgment and when the judgment amount became certain (which was not until at least August 22, 2019). By the time Johnson's judgment

---

[7] According to the proposed second amended complaint, "[w]here Penn National elects to appeal, however, the Umbrella Policy contract also requires Penn National to pay '[t]he cost of appeal bonds.'" (SAC ¶ 60 (quoting § 1.2.e(2)). To the extent Johnson argues that Penn National's ability to appeal was contingent on paying the cost of appeal bonds per § 1.2.e(2) of the umbrella policy, which it apparently did not do, it is not clear whether any appeal bonds were necessary to contest the amount of Johnson's judgment.

7

amount became certain, Penn National had already paid up to the applicable limit of insurance, and no longer had a contractual obligation to pay Johnson's judgment against the City Homes defendants. Accordingly, Johnson has not plausibly alleged a contractual obligation that Penn National breached, and the court will deny leave to amend to add the breach of contract claim.

### b. Bad faith failure to settle[8]

Under Maryland law, when an insurer undertakes to defend its insured, it may be liable for the "wrongful failure to settle a claim against its insured within policy limits." *Mesmer v. Maryland Auto. Ins. Fund*, 353 Md. 241, 259 (1999). Therefore, while "[a]n insurer does not have an absolute duty to settle a claim within policy limits . . . it may not refuse to do so in bad faith." *Allstate Ins. Co. v. Campbell*, 334 Md. 381, 396 (1994). The failure to settle may be in bad faith if it is not "an informed judgment based on honesty and diligence." *State Farm Mut. Auto. Ins. Co. v. White*, 248 Md. 324, 333 (1967); *see also Mesmer*, 353 Md. at 261. Factors that might show bad faith include: the likelihood of a verdict in excess of policy limits; lack of proper investigation or evaluation of the accident or the plaintiff's disability; failure of the insurer to inform the insured of a compromise offer within or near the policy limits; pressure by the insurer on the insured to contribute to the settlement within policy limits; and "actions which demonstrate a greater concern for the insurer's monetary interests than the financial risk attendant to the insured's predicament." *State Farm*, 248 Md. at 332.

Here, Johnson has not adequately pled bad faith. Johnson argues that Penn National acted in bad faith when it failed to settle with Johnson prior to trial and when it failed to settle

---

[8] In his briefing, Johnson confirmed that the umbrella policy is "the Policy applicable to Plaintiff's bad faith failure to settle claim". (ECF 27, Opp'n to Mot. to Strike or Mot. to Dismiss at 2).

and/or pay the judgment after the trial concluded and instead allowed the funds to be exhausted.[9] (SAC ¶¶ 75, 76). The allegations state that Penn National chose to exhaust the policy limit by settling with other claimants or potential claimants and/or paying other judgments against the City Homes defendants, instead of settling with or paying Johnson. This does not show, however, that Penn National "demonstrate[d] a greater concern for [its] monetary interests than the financial risk attendant to the insured's predicament." First, there is no indication that Penn National saved money or attempted to save money by refusing to settle. Rather, both the bankruptcy plan and the allegations of the complaint show that Penn National was faced with multiple claims against its insured, and chose to pay the full amount of the umbrella policy to settle other claims rather than Johnson's.[10] Second, there is no indication that "the failure to settle with [Johnson] has substantially increased the danger to the insured of a judgment or judgments over policy limits," *see Hartford Cas. Ins. Co. v. Dodd*, 416 F. Supp. 1216, 1220 (D. Md. 1976), because by settling with other claimants, Penn National has presumably reduced the exposure of the City Homes defendants with regard to those claims. Therefore, the court will dismiss the claim for bad faith failure to settle in the first amended complaint, and deny the motion to amend it as futile.

### III. Claims relating to the general liability policy

#### a. Reformation based on mutual mistake

---

[9] The bankruptcy plan provides that the lead paint claimants will be entitled to enforce insurance rights against any lead paint insurance entity "to the same extent as [the debtors] would be entitled to enforce such rights, including but not limited to the [debtors'] right to assert willful, bad faith or negligent refusal to settle claims." (Plan, § 5.6(a)).

[10] Penn National first rejected a settlement offer from Johnson either before or during the February 2019 trial. (SAC ¶¶ 40, 75). Even assuming that Penn National rejected this offer with the hopes that it would not have to pay out the full extent of the umbrella policy (i.e., with some concern for its monetary interests), "[a]n insurer does not have an absolute duty to settle a claim within policy limits." *Allstate Ins. Co.*, 334 Md. at 396. Further, this rejection of the settlement offer did not lead to a judgment over the policy limits. At the time of the trial judgment, and as Johnson points out, there was enough money remaining in the policy to pay it. Rather, the money was exhausted paying other claimants against the City Homes defendants after the judgment. As discussed above, this on its own does not demonstrate bad faith.

Johnson argues that the City Homes defendants and Penn National intended for the per location endorsement to be included in the 95–96 policy, and its inadvertent omission is a mutual mistake that the court should correct through the equitable doctrine of reformation. Penn National argues that the claim is barred by either laches or waiver.[11]

In Maryland, a court may reform a contract "where there has been a mutual mistake—that is, where there has been a meeting of the minds—and an agreement actually entered into, but the instrument, in its written form, does not express what was intended by the parties thereto." *Kishter v. Seven Courts Cmty. Ass'n, Inc.*, 96 Md. App. 636, 640 (1993) (quoting *Moyer v. Title Guarantee Company*, 227 Md. 499, 505 (1962)). "Laches 'is a defense in equity against stale claims, and is based upon grounds of sound public policy by discouraging fusty demands for the peace of society.'" *Ross v. State Bd. of Elections*, 387 Md. 649, 668 (2005) (quoting *Parker v. Board of Election Supervisors*, 230 Md. 126, 130 (1962)). The defense of laches requires a showing of both inexcusable delay and prejudice. *Id.* at 670. Laches is an affirmative defense. *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 584 (2014). An affirmative defense may be reached on a motion to dismiss only in the "relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

The court will not find that laches bars Johnson's reformation claim at this time. "[S]ince laches implies negligence in not asserting a right within a reasonable time after its discovery, a party must have had knowledge, or the means of knowledge, of the facts which created his cause of action in order for him to be guilty of laches." *Parker*, 230 Md. at 131 (1962). Taking the

---

[11] Johnson is subject to the same defenses as could be asserted against City Homes. *See Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 647–48 (1999) (citing *Assurance Corp. v. Perkins*, 169 Md. 269, 284, 181 A. 436, 443 (1935)) (tort claimants who have obtained judgments against the insured, standing in the place of the insured, are subject to the same defenses as the insurer could assert against the insured).

10

allegations in the complaint as true, and drawing all inferences in favor of Johnson, it appears that, although the broker informed City Homes (through Mankowitz) that the per location endorsement was not initially included, that same letter informed Mankowitz that the broker would fix the error, (SAC ¶ 83), and Mankowitz therefore did not know the per location endorsement was not included until March 2019, when informed by Penn National, (*id.* ¶ 43).[12] Further, the 95–96 policy was a renewal of the already-issued general liability policy, and each of the previous policies for 1991 through 1995 included the per location endorsement. (*Id.* ¶¶ 9–10).

This case is therefore distinguishable from *AC & R Insulation Co., Inc. v. Penn. Manufacturers' Assoc. Ins. Co.*, 993 F. Supp. 2d 539 (D. Md. 2014), where, on a motion for summary judgment, the court found that the doctrine of laches barred an action for reformation of an insurance policy when there was evidence that the insured was aware of the exclusions at issue and the insurer had taken the position it would not defend certain lawsuits because of the policy exclusions over twenty years prior to the initiating of the reformation suit. *Id.* at 548–49. Here, taking the allegations as true, Mankowitz did not know that the omission of the per location endorsement was not corrected, nor does it appear that Penn National had previously asserted that the per location endorsement did not apply.[13]

---

[12] Johnson pleads certain allegations concerning Mankowitz "upon information and belief." These allegations are not "conclusory" but are instead based upon factual information and/or are "peculiarly within the possession of the defendant." *Malibu Media, LLC v. Doe*, No. PWG-13-365, 2014 WL 7188822, at *4 (D. Md. Dec. 16, 2014). What Mankowitz believed regarding the 95–96 policy is peculiarly within his possession, whether Penn National ever informed Mankowitz that the per location endorsement was not included is peculiarly within Penn National's and Mankowitz's possession, and that Mankowitz believed the per location endorsement was included is based on factual information such as Mankowitz's testimony in the bankruptcy court that the typical insurance coverage would be "a minimum of $1 million per unit for [sic] year," (SAC ¶ 25).

[13] It is true that the broker's knowledge that the per location endorsement was not included, if the broker was acting as an agent, might be binding on the City Homes defendants as the principals. *J.A.M. Assocs. of Baltimore v. W. World Ins. Co.*, 95 Md. App. 695, 705 (1993). From the proposed second amended complaint, however, the broker's knowledge of the omission of the per location endorsement and her exact relationship to the City Homes defendants are not clear.

Penn National also argues that the City Homes defendants ratified the insurance policies by agreeing to the bankruptcy plan, waiving their rights to bring a claim for reformation of the 95–96 policy, so that Johnson's claim, subject to the same defenses, is also waived. The confirmed bankruptcy plan provides that "[t]he rights of Lead-Paint Claimants to recover on or enforce such Claims against the Debtors and Reorganized Debtors shall be limited to the proceeds of Lead-Paint Insurance Policies applicable to their Lead-Paint Claim." (ECF 18-3, Plan, § 4.5). The plan "does not modify any of the rights or obligations of the Lead-Paint Insurance Entities or the Debtors under the Lead-Paint Insurance Policies or Insurance Settlement Agreements." (*Id.* § 4.4). Further, although specifically directed at the defenses that the insurers may assert, section 5.6(c) provides that "[n]othing relating to this Plan, the Disclosure Statement, the confirmation of this Plan or the entry of the Confirmation Order shall be construed as a waiver or admission with respect to any Lead-Paint Claim and all parties (expressly including the Lead-Paint Insurance Entities) shall be free to make any contentions permitted by applicable bankruptcy and non-bankruptcy law with respect to such Lead Paint Claims" and subsection g(ii) provides that nothing in the plan or related documents will "have any *res judicata*, collateral estoppel or other preclusive effect on any party's legal, equitable or contractual rights and obligations under any Lead Paint Insurance Policy[.]" (*Id.* § 5.6(c), (g)(ii)). It appears that the plan was not intended to modify any rights regarding the insurance policies, including equitable rights. Therefore, the court does not find that the City Homes defendants have waived the right to bring a claim for reformation.

Similarly, the plan does not preclude a reformation claim. As discussed above, the plan states that it would not have preclusive effect on equitable rights under any lead paint insurance policy. Further, the order confirming the plan provides that "[a]s set forth in section 7.2 of the

Plan, all insurance policies, including but not limited to Lead-Paint Insurance Policies, shall remain in full force and effect unless otherwise validly terminated, and issuers of such insurance policies shall remain responsible to the Reorganized Debtors for claims in accordance with the terms and provisions of such insurance policies *to exactly the same extent as they would be responsible to the Debtors or Non-Debtor Affiliates in the absence of this bankruptcy case.*" (ECF 18-4, Order Confirming Third Amended Chapter 11 Plan ¶ 13) (emphasis added). This further demonstrates that the plan does not preclude equitable claims relating to the insurance policies. *See Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1692 (2015) ("Confirmation has preclusive effect, foreclosing relitigation of any issue actually litigated by the parties and any issue necessarily determined by the confirmation order." (internal quotation marks and citation omitted)).

Finally, the court finds that Johnson has adequately pled a claim for reformation. At this stage, Johnson has adequately alleged that the failure to include the per location endorsement was a mutual mistake, even under the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Here, Johnson alleges that the general liability policies from 1991 to 1995, and 1996 to 1997, all included the per location endorsement, (SAC ¶¶ 8–11); at least one endorsement for lead paint exclusion was missing from the 1995–96 policy and was subsequently issued after the insurance broker corrected the error, (*id.* ¶ 15); Penn National did not tell Mankowitz why the per location endorsement was not included in the 1995–96 policy, (*id.* ¶ 18); and Penn National continued to collect a similar premium in 1995–96 as compared to the years when the per location endorsement was included

13

(*id.* ¶ 88).[14] These allegations plausibly allege,[15] with particularity, that the failure to include the per location endorsement was a mutual mistake, since the insurance policies before and after the 95–96 policy all included the endorsement, and it does not appear that Mankowitz was notified by Penn National that the per location endorsement was not included in the 95–96 policy. *See Charter Oak Fire Ins. Co. v. Am. Capital, Ltd.*, No. CIV.A. DKC 09-0100, 2011 WL 856374, at *15 (D. Md. Mar. 9, 2011)[16] (finding mutual mistake sufficiently pled as to whether an insurance policy was meant to also cover the defendant's subsidiaries, in part because the insurance company did not charge a "higher premium to account for the increased risks" of the subsidiaries, and stating the complaint need not "specifically describe instances wherein [the insurers] expressed their intentions with words" as the complaint "still contains sufficient facts to support an inference that the parties held a common understanding of what the insurance contract was meant to encompass that was different from the understanding memorialized in the Policies.").

### b. Maryland Insurance Code § 19-102(b)(2) and request for declaratory judgment under 28 U.S.C. § 2201

These claims also request the court to determine that the per location endorsement applies to the 95–96 general liability policy.[17] As such, these claims will likely involve the same

---

[14] It appears that the premium for commercial general liability coverage was $23,885.00 for the 93–94 policy (ECF 4-4 at 2); $31,321.00 for the 94–95 policy (ECF 4-5 at 2); $25,235.00 for the 95–96 policy (ECF 4-6 at 2); and $34,113.00 for the 96–97 policy (ECF 4-7 at 2). Therefore, it does appear that the 95–96 policy contained a lower premium. It is not clear at this stage, though, whether other factors caused the premium to be lower, or whether the amount of the reduction is consistent with removing the per location endorsement.

[15] Johnson, of course, will eventually need to prove "clearly and beyond a reasonable doubt the original intent of the parties and the existence of a mistake in the written agreement." *Kishter*, 96 Md. App. at 640–41.

[16] Unreported cases are cited for the soundness of their reasoning, not for any precedential value.

[17] Penn National is correct that Count II of the proposed second amended complaint, the § 19-102(b)(2) claim, does not state whether it is brought in relation to the general liability policy or umbrella policy. Since the parties do not dispute that the umbrella policy is exhausted, the court assumes Count II is brought to recover under the general liability policy. To the extent Count II seeks to recover under the umbrella policy, it fails to state a claim.

discovery as the claim for reformation, which is already going forward. Therefore, the court will not dismiss these claims at this time.

### IV. Motion to dismiss and motion to strike the jury demand

Penn National's first motion to dismiss was in response to the first complaint, which is no longer the operative complaint, and that motion will be denied as moot. The motion to strike the jury demand was in response to the first complaint, which contained a claim for injunctive relief and a claim for declaratory judgment. (ECF 11, Mot. to Strike at 1). As additional claims were added and are going forward, the motion to strike will be denied without prejudice to renewal if a summary judgment motion is filed.

### CONCLUSION

Accordingly, the court will grant in part and deny in part Penn National's motion to strike or dismiss the first amended complaint and Johnson's motion for leave to file a second amended complaint. The court will grant Penn National's motion to dismiss as to the bad faith failure to settle claim (Count I of the first amended complaint), and otherwise will deny the motion. The court will deny Johnson's motion for leave to amend as to the claim for breach of contract (Count I of the proposed second amended complaint) and the claim for bad faith failure to settle, and otherwise will grant the motion. The court will deny as moot Penn National's first motion to dismiss and deny without prejudice its motion to strike the jury demand. A separate order follows.

3/4/20
Date

_____
Catherine C. Blake
United States District Judge

15